# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ROBIN L. HAMPTON,           )
           )
        **Plaintiff,**    )
           )    **Civil Action No. 3:12-cv-00411**
**v.**             )    **Judge Nixon / Knowles**
           )
CAROLYN W. COLVIN,     )
**Acting Commissioner of Social Security,[1]**  )
           )
        **Defendant.**    )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Insurance ("SSI"), as provided under Title XVI of the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment Upon the Administrative Record. Docket No. 12. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 14.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment Upon the Administrative Record be DENIED, and that the decision of the

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin should therefore be substituted for Commissioner Michael J. Astrue as the Defendant in this action. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Commissioner be AFFIRMED.

# I. INTRODUCTION

Plaintiff filed her application for Supplemental Security Income ("SSI") on December 7, 2007,[2] alleging that she had been disabled since November 1, 1995, due to "Bi Polar II [*sic*]" disorder, fibromyalgia, chronic pain syndrome, chronic fatigue syndrome, chronic carpel tunnel syndrome, chronic lower back strain, chronic vertigo, and clinical depression. *See, e.g.,* Docket No. 9, Attachment ("TR"), pp. 173, 202. Plaintiff's application was denied both initially (TR 86) and upon reconsideration (TR 88). Plaintiff subsequently requested (TR 98) and received (TR 114) a hearing. Plaintiff's hearing was conducted on May 21, 2010, by Administrative Law Judge ("ALJ") Brian Dougherty. TR 32. Plaintiff and Vocational Expert, Gail Ditmore, appeared and testified. *Id.*

On August 24, 2010, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 26. Specifically, the ALJ made the following findings of fact:

> 1. The claimant has not engaged in substantial gainful activity since November 26, 2007, the application date (20 CFR 416.971 *et seq.*).
>
> 2. The claimant has the following severe impairments: obesity, mild lumbar spondylosis at L5/S1, fibromyalgia and chronic obstructive pulmonary disease (20 CFR 416.920(c)) [*sic*]
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P,

_____

[2] Plaintiff protectively filed her application on November 26, 2007. *See, e.g.,* TR 14, 25, 26, 86, 88.

Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity (RFC) to perform lifting and/or carrying of 50 pounds occasionally and 25 pounds frequently; standing and/or walking of 6 hours in an 8 hour workday; sitting of 6 hours in an 8 hour workday; unlimited pushing and/or pulling; avoidance of concentrated exposure to fumes, odors, dusts, gases; able to understand, remember and carry out simple and detailed instructions; able to concentrate, focus and perform such tasks with adequate persistence and pace; not easily frustrated and able to work with average speed; social skills are mildly limited, but adequate; no limitation in adaptive skills.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was 46 years old (a younger individual age 18-49) on the date the application was filed (20 CFR 416.963).

7.      The claimant has a high school education and one year of college, and is able to communicate in English (20 CFR 416.964).

8.      The claimant has acquired work skills from past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 416.969, 416.969(a) and 416.968(d)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since November 26, 2007, the date the application was filed (20 CFR 416.920(g)).

TR 14-25.

On September 16, 2010, Plaintiff timely filed a request for review of the hearing

decision. TR 170. On March 16, 2012, the Appeals Council issued a letter declining to review the case (TR 1-3), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III. CONCLUSIONS OF LAW

### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he

or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175,

1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by

relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the

---

[3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ: (1) did not accord appropriate weight to Plaintiff's treating physicians, and (2) erred in determining that Plaintiff was not fully credible. Docket No. 13. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can

be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

**1.  Weight Accorded to Opinion of Plaintiff's Treating Physicians**

Plaintiff maintains that the ALJ failed to adequately consider the opinion of Angela Wood, APRN and Dr. Cynthia Rector, M.D.[4] Docket No. 13. Specifically, Plaintiff argues that the ALJ relied "primarily on the limitations, or lack thereof," assessed by consultative psychological examiner, Dr. Kathryn Sherrod when "attempt[ing] to discount the opinions of the Plaintiff's long-time mental health provider," and did not provide "good reasons" for discounting the opinion of Plaintiff's treating physician. *Id.* at 12. Plaintiff further contends that the ALJ did not discuss "any of the specific factors required by the Sixth Circuit case law to discount the opinion of a treating physician." *Id.* Plaintiff also maintains that the ALJ's decision to discount Nurse Wood and Dr. Rector's opinion was not supported by substantial evidence. *Id.* at 14.

Defendant responds that the ALJ was not required to defer to an unsupported conclusory opinion of disability submitted by treating physicians, and that the ALJ properly weighed Nurse Wood and Dr. Rector's opinion. Docket No. 14. Defendant specifically contends that the ALJ indicated that he did not give the treating physician medical source statement much weight

---

[4] The opinion to which Plaintiff is referring is a single medical source statement signed by both Nurse Wood and Dr. Rector. TR 563-565.

because it was inconsistent with the clinical findings. *Id.*

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. . . .
>
> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. . . .
>
> (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
>
> (5) Specialization. We generally give more weight to the

> opinion of a specialist about medical issues related to his or her area
> of specialty than to the opinion of a source who is not a specialist.
>
> . . .

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

   The ALJ must articulate the reasons underlying his decision to give a medical opinion a specific amount of weight.[5]  *See, e.g.,* 20 C.F.R. § 404.1527(d); *Allen v. Commissioner*, 561 F.3d 646 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004).  The reasons must be supported by the evidence and must be sufficiently specific so as to make clear to any subsequent reviewers the weight the ALJ gave to the treating source medical opinion and the reasons for that weight.  SSR 96-2p.

   The Sixth Circuit has held that, "provided that they are based on sufficient medical data, the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."  *Howard v. Commissioner*, 276 F.3d 235, 240 (6th Cir. 2002) (*quoting Harris v. Heckler*, 756 F.3d 431, 435 (6th Cir. 1985)).  If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical
> source who provides you or has provided you, with medical

---

[5] There are circumstances when an ALJ's failure to articulate good reasons for the weight accorded to medical opinions may constitute harmless error: (1) if a treating source opinion is so patently deficient that the ALJ could not possibly credit it; (2) if the ALJ adopts the opinion or makes findings consistent with the opinion; and/or (3) if the ALJ has complied with the goal of 20 C.F.R. §1527(d), by analyzing the physician's contradictory opinions or by analyzing other opinions of record.  *See, e.g., Friend v. Commissioner*, 375 Fed. Appx. 543, 551 (6th Cir. April 28, 2010); *Nelson v. Commissioner*, 195 Fed. Appx. 462, 470-72 (6th Cir. 2006); *Hall v. Commissioner*, 148 Fed. Appx. 456, 464 (6th Cir. 2006).

treatment or evaluation and who has, or has had, an ongoing
treatment relationship with you.

20 C.F.R. § 404.1502.

Treatment records indicate that Nurse Wood[6] was one of Plaintiff's treating sources, a fact that would justify the ALJ's according greater weight to her opinion than to other opinions, as long as that opinion was supported by medically acceptable clinical and laboratory diagnostic techniques, and consistent with the evidence of record. Nurse Wood's opinion, as enunciated in the medical source statement (TR 563-565), however, contradicts other substantial evidence in the record, including Plaintiff's treatment records. Contrary to Plaintiff's assertion that the ALJ did not consider any of the requisite factors, the ALJ discussed how the medical source statement was contradicted both by other medical evidence and by Plaintiff's testimony regarding her daily activities. Specifically, the ALJ stated:

> A medical source statement was prepared by Nurse Wood (APN)
> in May 2009, signed by Dr. Rector, apparently connected to
> Lifecare (according to her representative's statements at the
> hearing). (Exhibit 17F) Apparently, Nurse Wood relied heavily
> upon subjective complaints of symptoms and therefore, her
> assessment may not represent an objective opinion . . .
> Furthermore, the Wood/Rector assessment is not well supported by
> clinical findings (Exhibit 18F indicated her mood was "stable"
> with no symptoms of psychosis, mania, anxiety or depression; is
> able to concentrate, remember and her judgment, reliability and
> insight are fair) or psychological diagnostic techniques, and is not
> inconsistent [*sic*] with other substantial evidence (she is able to
> help her husband run his construction company, including a good
> range of daily activities performed [*sic*]. For all these reasons, the
> Wood/Rector opinion is entitled to less weight. (20 CFR
> 404.1527(d)(3) and (d)(4))

---

[6] Dr. Rector is not listed as Plaintiff's treating physician on any of the treatment notes provided by LifeCare. TR 372-400, 434-54, 525-61, 566-86.

TR 24, *citing* TR 562-65, 566-86.

As the Regulations state, the ALJ is not required to give controlling weight to a treating source's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating source's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* Because Nurse Wood's opinion was based on Plaintiff's subjective complaints, and was inconsistent with other evidence of record, including Plaintiff's reported daily activities, the Regulations do not mandate that the ALJ accord Nurse Wood's evaluation controlling weight. Accordingly, Plaintiff's argument that the ALJ did not accord proper weight to Nurse Wood's medical source statement fails.

**2. Credibility of Plaintiff's Subjective Complaints**

Plaintiff contends the ALJ erred in finding that her subjective complaints were not fully credible. Docket No. 13. Specifically Plaintiff argues that the ALJ improperly relied on the contradictions between a report by consultative psychological examiner Kathryn Sherrod, Ph.D. and Plaintiff's own testimony. *Id.* Plaintiff asserts that since this report was "totally unsupported upon even cursory examination," its findings should not have been used to determine Plaintiff's credibility. *Id*. at 16. Plaintiff further asserts that the because the ALJ believed that Plaintiff was not entirely credible, he improperly "gloss[ed] over the objective medical evidence in the file which supports a diagnosis of [fibromyalgia]" and "fail[ed] to consider adequately the pain and fatigue caused by this condition." *Id.* at 17. Plaintiff also asserts that the ALJ never discussed the fact that Plaintiff's narcotic treatment for fibromyalgia had been ongoing for "a number of years," or the fact that Dr. Sullivan's office had signed a

request for a handicapped parking placard for Plaintiff due to her fibromyalgia.  *Id.*  Plaintiff

additionally argues that the ALJ erroneously discredited Plaintiff's complaint of carpal tunnel

syndrome on the basis of  psychologist's opinion regarding this condition, which was improper

considering this was not within the psychologist's area of expertise.  *Id.* at 16.

Defendant responds that the consultative psychological examiner's report was based on

her professional observations of Plaintiff, as well as valid psychological testing, and therefore

constitutes valid evidence in support of the ALJ's determination that Plaintiff's subjective

complaints were not entirely credible.  Docket No. 14.  Defendant additionally argues that, when

making his credibility determination, the ALJ considered contradictions in Plaintiff's testimony

regarding the reasons she had left her previous jobs and contradictions in Plaintiff's self-reported

daily activities.  *Id.* Defendant further argues that the ALJ also considered medical evidence

relating to Plaintiff's complaints of fibromyalgia and carpal tunnel syndrome.  *Id*.  Defendant

concludes that because the ALJ specifically addressed all of this evidence, he could properly find

Plaintiff's subjective complaints concerning her bipolar disorder, fibromyalgia, and carpal tunnel

syndrome to be less than fully credible.  *Id*.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations

of disabling symptoms:

> [S]ubjective allegations of disabling symptoms, including pain,
> cannot alone support a finding of disability...[T]here must be
> evidence of an underlying medical condition *and* (1) there must be
> objective medical evidence to confirm the severity of the alleged
> pain arising from the condition *or* (2) the objectively determined
> medical condition must be of a severity which can reasonably be
> expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d

Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other."). Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

Despite Plaintiff's assertion that Dr. Sherrod's report was "groundless" and therefore should not have been considered by the ALJ when determining Plaintiff's credibility, the ALJ found that Dr. Sherrod's assessment was "well supported by clinical findings and psychological

14

diagnostic techniques," and "not inconsistent with other substantial evidence, including good

ability to perform activities of daily living." TR 24. Specifically, Dr. Sherrod's assessment was

consistent with assessments from LifeCare and from Kathryn Steele, Psy. D., which the ALJ

discussed as follows:

> In February 2008, Dr. Sherrod reported Mrs. Hampton acted like she was being inconvenienced by having to participate in the consultative mental status examination (CE). Dr. Sherrod reported the claimant's effort on testing tasks was "marginal." Dr. Sherrod reported she responded carelessly and quickly, and gave up quickly, at times. She refused to attempt serial 7's and she appeared to make intentional errors. For example, when asked to close her eyes and touch her fingers to her nose, she touched her finger to her mouth, nose and then cheek. When asked to close her eyes and touch her left finger to her nose, she touched her upper lip and her cheek. Dr. Sherrod reported this task is usually performed correctly, even by individuals who have suffered strokes or other serious illness. However, Dr. Sherrod reported her effort on testing was sufficient to provide an estimate of her current level of functioning. Dr. Sherrod reported she understood test directions, did not require any test be explained in simpler terms, had adequate concentration when responding to questions, had adequate eye contact and her statements made sense. When asked to name a fourth President, she said she did not know the name of the governor of Tennessee. When asked to close her eyes and touch her right finger to her nose, she touched her upper lip three times. On Bender Gestalt Test, she worked haphazardly and carelessly, but completed the drawings within the normal time limits. She had no motor tremor and exhibited adequate organizational skills. Significantly, Dr. Sherrod reported the symptoms Mrs. Hampton described did not support the earlier diagnosis of bipolar disorder NOS and that she appeared to be "more functional than she claims." (Exhibit 9F)

> In February 2008, LifeCare reported increased stressors accompanied by increased symptoms. In April 2008, her mood was relatively stable, her memory was intact, she was able to concentration [*sic*], and she had normal thought content, tearful affect and depressed mood. In April 2008, she had increased stressors with accompanying symptoms of major depression. In June 2008, Vistaril was started for anxiety. Her memory (recent,

15

immediate and remote) was intact, she was able to concentration [*sic*], her thought content was disordered, her affect was bland and she had euthymic mood.  In August 2008, her mood was "stable" with a flat affect.  Mental status examination revealed she was able to concentrate and had intact memory, despite her reports of poor concentration.  In November 2008, she was "coping well" with relatively "stable" mood."  There were no symptoms of psychosis, mania, depression or anxiety.  In March 2009, faced with eviction with no place to go, her mood was dejected.  The mental health provider reported "she does not personally assume any responsibility for current situation" and was angry with her husband.  (Exhibits 13F, 16F)  In October 2009 and in February 2010, she was able to concentrate, had intact memory, had normal thought and "stable" mood.  Despite the stressors of being separated from her husband and facing eviction she was "coping well."  In March 2010, she had "stable" mood, "appropriate" affect, was able to concentrate, had normal thought content and had intact memory.  She was coping well with the situation, her mood was "stable" and she had no symptoms of psychosis or mania.  Anxiety was manageable and directly related to her stressors.  Nevertheless, LifeCare kept her GAF scores in the 40's (Exhibit 18F), which are scores very inconsistent with the latest clinical findings of an ability to concentrate, intact memory, normal thought, "stable" mood, "coping well," appropriate affect, no symptoms of psychosis or mania and reports that anxiety was manageable with medication.

In July 2010, Kathryn Steele, Psy. D., performed a consultative mental status examination (CE).  The claimant arrived alone, appeared calm and arrived promptly.  She had driven herself.  She wore glasses; her affect was appropriate; her mood appeared flat; and thinking was organized.  Her self-reported evidence of delusions was explained as: she dreamed of events before they occurred.  She self-reported evidence of hallucinations, saying she saw and heard deceased family members, and unknown voices telling her to harm herself.  Attention was intact in the CE setting with "mildly" impaired concentration.  Estimated intellectual functioning was in the average range.  She was able to recall 2/3 of the items after 5 minutes; however, she was capable of providing detailed information regarding her past, her daily activities and medications from memory, which remained intact (short and long term).  She met the criteria for a mood disorder, but symptoms appeared to be "well managed" through medication and psychotherapy.  Dr. Steele assessed a GAF of 55, which is

consistent with moderate limitations.

TR 15-17, *citing* TR 401-07, 434-54, 525-61, 566-86.

Additionally, the ALJ properly factored into his credibility determination the inconsistencies between Dr. Sherrod's report and Plaintiff's testimony and reported daily activities, and discussed Dr. Sherrod's findings regarding Plaintiff's bipolar disorder as follows:

> . . . She did appear to be "mildly depressed," but did not present as a person with significant mental health issues. Dr. Sherrod further recommended a formal test for malingering, such as SIRS. The diagnoses included dysthymic disorder, nicotine dependence (three packs per day) and rule out cannabis and cocaine abuse. Interestingly, her GAF was 60 to 65, which is consistent with mild to moderate limitations.

TR 17-18, *quoting* TR 406.

Also when considering Plaintiff's credibility, the ALJ discussed psychological evidence concerning Plaintiff's social functioning, concentration, and "episodes of decompensation" stating:

> Regarding social functioning, in 2007, the claimant reported she was married to her second husband and raising three children. She said she visited others. She said she weekly participated in community, church, sports or social group, i.e., she ran a cub scout meeting. She reported recent stressors of the death of her stepfather, her mother had been sick, her husband had heart problems and her husband's business was being audited by the IRS. She said she visited others mostly on the telephone. She said she did not get along with authority figures. In February 2008, her children's ages were 9, 11 and 17. She reported she had no friends, but on psychologist testing, she named three of her neighbors. The examining psychologist reported she had mild limitation in this area. (Exhibits 5E, 6E, 14E, 8F, 9F) A state agency psychologist reported she had mild limitation in this area. (Exhibit 12F) Therefore, based upon a preponderance of the evidence, it is determined there is mild limitation in this area.
>
> Regarding concentration, persistence or pace, in September 2007,

treatment records showed she was "able to concentrate" and had an intact memory. She said she could pay attention for maybe one hour. She said she followed written and spoken instructions "okay." In July 2010, Dr. Steele reported her attention was intact in the CE setting. (Exhibits 6E, 8F, 20F) Dr. Sherrod reported she had no limitation in understanding and remembering, no limitation with her memory, no limitation in her ability to concentrate, no limitation in persistence or pace, and no limitation in adaptive skills. (Exhibit 9F) Dr. Sherrod's assessment is well supported by clinical findings and psychological diagnostic techniques, and is not inconsistent with other substantial evidence, including her ability to perform activities of daily living. Therefore, based upon a preponderance of evidence, it is determined there are no limitations in this area.

Regarding episodes of decompensation in work or work-like setting, no reviewing, treating or examining physician, psychiatrist or nurse practitioner reported any such episodes. The claimant alleged decompensation at work; however, the objective evidence does not support these allegations. Furthermore, two state agency psychologists report there have been no such episodes. Therefore, based upon a preponderance of the evidence, it is determined there have been no such episodes.

TR 18-19, *citing* TR 223-32, 261-69, 372-407, 420-33, 608-15.

Additionally, the ALJ discussed Plaintiff's reported daily activities, which were inconsistent with her subjective claims, stating:

Regarding activities of daily living, in 2007, she reported she enjoyed riding horses and had "lots of animals." She reported she cared for her children and her mother who was disabled. She indicated she was taking care of the children and the animals, and was scoutmaster for her son's troop. Her husband reported the claimant did "not make the kids help her with chores at home." The husband further admitted that his lack of helping around the home did not make her very happy. She reported she feeds the cats and dogs. She said her hobbies and interests included reading, horses and sewing. The claimant reported her husband showed lack of concern in financial matters and in participating in family care. Also, she said "they have been trying to remodel home." In addition, she reported she could count change, handle a savings account and use a checkbook/money orders. In November 2007,

treatment records showed she did domestic duties including childcare.  In December 2007, her physically and mentally ill daughter came home and they helped an 18 year old, pregnant teen by allowing her to live with them.  In February 2008, she reported she got up at 6 a.m., ate a simple breakfast, got her children up, prompted them to get ready for school, drove them to the end of the street to the bus stop, skipped lunch and slept in the afternoon.  However, when asked who cared for her three children, she said she picked the children up, made sure they did their homework, fixed supper (tacos or something easy) and went to bed after supper.  When asked if she performed any tasks for the children after supper, she said she made sure they showered and got in bed.  She reported she usually went to bed at 7 p.m., adding that she was "up and down."  She explained that when she felt good, she prepared all the meals, worked in the morning and afternoon, relaxed after supper, went to bed at 9 p.m., slept well, had no hobbies, and missed being a scout leader, riding horses, sewing and reading, adding she no longer participated in these activities due to pain. [In July 2007, she reported she enjoyed riding horses and reported they had "lots of animals."] In addition, she was able to attend to all self-care needs unassisted, get up in the morning, bathe, wash her hair, brush her teeth, comb her hair, dress unassisted, perform "some" household chores (although other evidence indicates she did all the household chores and child care, because her husband did not help and she did not make the children help), such as cook easy meals and wash dishes.  She also reported her daughter washed clothes.  When asked if she was able to make the beds, she responded "it's doubtful."  She also indicated that on a bad day (3 or 4 days a week), she could not get up.  She said she attended church services once or twice a month, did not have any friends, did not visit her family, did shop for groceries, prepared a list of items to remember and her husband drove her to the store.  However, she reported she owned a vehicle and had a driver's license.                          . . .

In April 2008, she "helps husband run a construction company."  In August 2008, she and her family had been on vacation in Florida.  They took the children swimming and they played board games, and her husband agreed to get a second job.  In September 2008, she reported her husband and children had to do the house cleaning.  She said she was able to do laundry and light cleaning on good days. . . . In June, July, September, November and December 2009 and in February and March 2010, she continued to

help her husband run a construction company. In July 2010, she reported a "very limited daily routine," which included getting up at 9 a.m., playing on the computer, reading the Bible until 12.30 [*sic*] p.m., taking naps for 2 hours, talking to her children and watching television. She said she went to bed at 9 p.m., slept good on medication, attended to household chores such as laundry and cooked a full meal at least twice a week. She said she had not been to the grocery store in 6 months due to "her dislike of leaving the house." She said she showered every other day, brushed her teeth once a day and dressed only to attend appointments. However, she was able to drive herself to the CE, arrived promptly and came alone. Upon arrival, she appeared calm. She completed paperwork independently and was observed to be organized and detailed in doing so. She was neat and clean and casually dressed in floral pants, a blouse and sandals. (Exhibits 5E, 6E, 9E, 13E, 14E, 8F, 13F, 16F, 18F) There is voluminous evidence which indicates the claimant has a great range of daily activities. Therefore, based upon a preponderance of the evidence, it is determined there is no limitation in the area.

TR 17-18, *citing* TR 223-32, 244-45, 259-69, 372-400, 434-54, 525-61, 566-86, 609 (bracketing original).

In addition to the aforementioned, the ALJ also considered contradictions in Plaintiff's statements regarding her work history. The ALJ specifically stated:

At the hearing, the claimant testified she would "go manic" and "do something stupid" which had cost her "every" job. However, her earlier reports indicate there were several other reasons for leaving jobs (other than her mental impairment). For example, in February 2008, the claimant reported she was not able to work "lately" because of brown recluse spider bites and possible methicillin-resistant staphylococcus aureus infection (MRSA). (Exhibit 9F, p 3) In February 2008, she told Dr. Sherrod she quit her first job working as a hotel maid "because of school." Dr Sherrod reported she did not fill out any further information regarding previous jobs and said she was "quite vague when questioned during the interview." When further questioned about her past work, "she vaguely responded, I've worked a bunch of different ones." When questioned further, she admitted she worked as an administrative assistant for Metro General Hospital from the fall of 1993 through June 1995, and reported she quit due

> to a manic phase. However, her husband spoke up and said "her boss was a dirty old man and she wouldn't go along with him." Then, she described a job, which lasted 18 months for a printing company. The documented reason for quitting, "the business closed." She also reported she had a waitress job for six months in 1995, which she left due to "my ex husband broke my left cheek." (Exhibit 9F)

TR 14, *quoting* TR 403.

As can be seen, the ALJ's decision specifically addresses in great detail not only the medical evidence, but also Plaintiff's testimony and her subjective claims, clearly indicating that these factors were considered. TR 14-21. It is clear from the ALJ's detailed discussion that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings and Plaintiff's own statements concerning work history and daily activities that were inconsistent with Plaintiff's allegations. This is within the ALJ's province.

Although Plaintiff contends that the ALJ "gloss[ed] over" evidence relating to Plaintiff's complaint of fibromyalgia, the ALJ considered the medical evidence relating to this complaint as well, and discussed it as follows:

> The claimant testified she had fibromyalgia (FM) which was diagnosed by a specialist years earlier; that she spent an entire year in bed. She indicated FM was treated with morphine and muscle relaxants twice a day. She testified FM prevented her from using her hands to button or zip her clothes. The medical evidence shows that in 2005, myofascial pain was diagnosed. She had tenderness to palpation over multiple trigger points with full range of motion in lower extremities and full (5+/5) muscle strength bilaterally in the upper and lower extremities. (Exhibit 5F) In 2008 and early 2009, Dr. Sullivan treated FM with associated weight gain and menopause. He regularly refilled a prescription for MsContin [*sic*] (Exhibit 15F), apparently not aware of her history of polysubstance abuse. In January 2010, Dr. Sullivan assessed generalized fibromyalgia (FM). (Exhibit 19F) There is no indicate [*sic*] the claimant required ongoing trigger point injections or she may have opted to receive narcotics. The medical evidence

supports FM may cause some pain, and in combination with other impairments, may necessitate reduction in lifting and/or carrying to 50 pounds occasionally and 25 pounds frequently, which is added to the RFC.

TR 21 *citing* TR 315-35, 469-524, 587-607.

Contrary to Plaintiff's argument otherwise, the ALJ discussed the totality of the evidence relating to Plaintiff's complaint of carpal tunnel syndrome as follows:

The claimant testified she had moderate carpal tunnel syndrome (CTS). The medical evidence shows that in 1997, bilateral carpal tunnel syndrome (CTS) was diagnosed without benefit of electrodiagnostic testing. (Exhibit 2F) In 2005, she had full (5+/5) muscle strength bilaterally in the upper and lower extremities. Treatment records indicate a neurologist diagnosed her with CTS (Exhibit 5F); however, these records cannot be located in the record. In February 2008, an examination showed fine motor skills were within normal limits. (Exhibit 9F) Without electrodiagnostic studies, surgical records or clinical findings, allegations of bilateral CTS represent a medically non-determinable impairment or at most, a "non-severe" impairment.

TR 14, *citing* TR 304-09, 315-35, 401-07.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler,*

742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)).  If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

After assessing the medical and testimonial evidence of record, the ALJ determined that:

> Inconsistencies of record detract from credibility.  The claimant testified she had lost every job due to mental symptoms.  However, the record reveals she lost jobs for numerous other reasons (see discussion under finding number one).  Also, her activities of daily living are inconsistent with allegations of disability (see discussion on pages 6 and 7).  In 2007, her mental health provider reported her medical compliance was "moderately" cooperative.  (Exhibit 8F) In February 2008, she reported she was "trying to get her disability and she was "afraid" if she gets a job she may not get disability."  (Exhibit 8F, p 28)  This statement clearly shows failure to work may have been connected to her desire to receive monetary gain in the form of disability benefits.  Additionally, she reported she had not received vocational rehabilitation services, employment services or other support services that could help her get back to work.  (Exhibit 3E)  It is noted the evidence does not indicate she has taken the initiative to seek such services.  She alleges she has been unable to perform any type of gainful employment since November 26, 2007.  However, substantial evidence indicates she has no physical limitations which preclude the performance of any exertional level of work activity (for specific restrictions see the RFC at finding number four).  Additionally, her performance of driving, shopping, caring for three minor children and housecleaning belie allegations of disability.  Inconsistencies give validity to the belief that symptoms and limitations have been overstated.  When the objective evidence and daily activities are measured against testimony, allegations of disability become less credible.  When measured against an inconsistent work history, as seen in her earnings record (Exhibit 5D), testimony regarding her inability to perform any type of work activity becomes even less credible.  Therefore, it is determined suggestions of symptom overstatement, lack of initiative in seeking vocational rehabilitation assistance, numerous discrepancies of record, a wide range of daily activities, evidence suggestive of malingering and inaccurate statements

> regarding illegal drug use cause credibility to be adjudged as
> questionable.

 TR 22, *citing* TR 192-93, 201-10, 372-400.

The ALJ observed Plaintiff during her hearing, assessed the medical records, reached a reasoned decision, and articulated his reasons for that decision; the ALJ's finding that none of the ailments alleged by Plaintiff was severe enough to preclude her from gainful employment is supported by substantial evidence and the decision not to accord full credibility to Plaintiff's subjective allegations was proper.  Therefore, this claim fails.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment Upon the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court.  Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections.  Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge