IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ROBIN L. HAMPTON, )
)
    Plaintiff, )
)   No. 3:12-cv-00411
v. )
)   Judge Nixon
CAROLYN W. COLVIN, )   Magistrate Judge Knowles
Commissioner of Social Security, )
)
    Defendant. )

## ORDER

Pending before the Court is Plaintiff Robin L. Hampton's Motion for Judgment on the

Administrative Record ("Motion") (Doc. No. 12), filed with a Brief in Support (Doc. No. 13).

Defendant Commissioner of Social Security ("Commissioner") filed a Response in Opposition.

(Doc. No. 14.) Magistrate Judge Knowles issued a Report and Recommendation ("Report"),

recommending that Plaintiff's Motion be denied and the decision of the Commissioner be

affirmed. (Doc. No. 15 at 24.) Plaintiff filed an Objection to the Report ("Objection"). (Doc.

No. 16.) For the reasons stated below, the Court **ADOPTS** the Report in its entirety and

**DENIES** Plaintiff's Motion.

I.    BACKGROUND[1]

    *A. Procedural Background*

    Plaintiff protectively filed her SSI application on November 26, 2007. (Tr. 86.) The

Social Security Administration denied Plaintiff's application initially on March 28, 2008 (Tr. 86–

87), and upon reconsideration on October 17, 2008 (Tr. 88–89). Plaintiff then filed a written

---

[1] An electronic copy of the administrative record is docketed in this case at Doc. No. 9.

request for a hearing before an ALJ on October 24, 2008. (Tr. 98.) Administrative Law Judge

("ALJ") Brian Dougherty conducted the hearing on May 21, 2010, with testimony from Plaintiff

and Vocational Expert ("VE") Gail Ditmore. (Tr. 32.)

On August 24, 2010, ALJ Dougherty issued an unfavorable decision to Plaintiff, finding

that she was not disabled under the meaning of the Social Security Act. (Tr. 26.) Specifically,

ALJ Dougherty made the following findings:

1. The claimant has not engaged in substantial gainful activity
   since November 26, 2007, the application date (20 CFR
   416.971 *et seq.*)

2. The claimant has the following severe impairments: obesity,
   mild lumbar spondylosis at L5/S1, fibromyalgia and chronic
   obstructive pulmonary disease (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of
   impairments that meets or medically equals one of the listed
   impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20
   CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the
   undersigned finds the claimant has the residual functional
   capacity (RFC) to perform lifting and/or carrying of 50 pounds
   occasionally and 25 pounds frequently; standing and/or
   walking of 6 hours in an 8 hour workday; sitting of [sic] 6
   hours in an 8 hour workday; unlimited pushing and/or pulling;
   avoidance of concentrated exposure to fumes, odors, dusts,
   gases; able to understand, remember and carry out simple and
   detailed instructions; able to concentrate, focus and perform
   such tasks with adequate persistence and pace; not easily
   frustrated and able to work with average speed; social skills are
   mildly limited, but adequate; no limitation in adaptive skills.

5. The claimant is unable to perform any past relevant work (20
   CFR 416.965).

6. The claimant was 46 years old (a younger individual age 18-49) on the date the application was filed (20 CFR 416.963).

7. The claimant has a high school education and one year of college, and is able to communicate in English (20 CFR 416.964).

8. The claimant has acquired work skills from past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 416.969, 416.969(a) and 416.968(d)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since November 26, 2007, the date the application was filed (20 CFR 416.920(g)).

(Tr. 14–25.)

On September 16, 2010, Plaintiff sought review of ALJ Dougherty's decision from the SSA Appeals Council. (Tr. 170.) On March 16, 2012, the Appeals Council declined to review the case (Tr. 1–3), thereby rendering the decision of ALJ Dougherty the final decision of the Commissioner.

Plaintiff filed this action on April 26, 2012, to obtain judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g). (Doc. No. 1.) Pursuant to Magistrate Judge Knowles's order of June 26, 2012 (Doc. No. 11), Plaintiff filed a Motion for Judgment on the Record with a Brief in Support on July 24, 2012. (Doc Nos. 12; 13.) The Commissioner filed a Response on August 22, 2012. (Doc. No. 14.) Magistrate Judge Knowles issued his

Report and Recommendation on July 15, 2013, recommending that Plaintiff's Motion be denied. (Doc. No. 15.)

Plaintiff filed an Objection to the Report on July 25, 2013, arguing that ALJ Dougherty's decision was not supported by substantial evidence. (Doc. No. 16.) Specifically, Plaintiff asserts that ALJ Dougherty erred by: (1) failing to give appropriate weight to the opinion of Plaintiff's treating sources, Ms. Wood and Dr. Rector of LifeCare; and (2) concluding that Plaintiff's testimony was not credible. (*Id.* at 1–3.)

*B. Factual Background*

On December 7, 2007,[2] Plaintiff filed an application for Supplemental Security Income ("SSI"), alleging disability since November 1, 1995, due to "Bi Polar II, Fibromyalgia, Chronic Pain Syndrome, Chronic Fatigue Syndrome, Chronic Carpel [sic] Tunnel Syndrome, Chronic Lower Back Strain, Chronic Vertigo, [and] Clinical Depression." (Tr. 173, 202.) At the hearing before ALJ Dougherty on May 21, 2010, Plaintiff and her counsel agreed to amend her disability onset date to November 26, 2007, for administrative purposes. (Tr. 36–38.)

1. Physical Impairments

Plaintiff was diagnosed with bilateral carpal tunnel syndrome in 1997. (Tr. 305.) In April 2005, Plaintiff began receiving care from the Pain Management Group (Tr. 326), but she was discharged from the Pain Management Group in September 2005 after providers felt that they had "no further options for the patient from a procedure standpoint." (Tr. 315, 317.) From Plaintiff's last visit with the Pain Management Group, Dr. James Ladson reported Plaintiff's muscle strength met or exceeded normal levels of active range of motion and muscle resistance. (Tr. 317.) In February 2008, Dr. Kathryn B. Sherrod reported, in a psychological evaluation

---

[2] Plaintiff protectively filed her application on November 26, 2007. (*See, e.g.*, Tr. 14, 25, 26, 86, 88.)

requested by the Office of Social Security Disability, that Plaintiff's fine motor skills were within normal limits. (Tr. 401.) At the hearing before ALJ Dougherty on May 21, 2010, Plaintiff testified that she has moderate carpal tunnel in both hands and was experiencing constant burning and tingling in her left hand. (Tr. 52.)

At the hearing, Plaintiff testified that her fibromyalgia symptoms began in 1995. (Tr. 48.) A doctor with the Pain Management Group diagnosed Plaintiff with fibromyalgia in April 2005.[3] (Tr. 330–32.) During her intake examination, the physician found sixteen out of eighteen fibromyalgia "trigger points" indicated the presence of fibromyalgia, along with other areas of tenderness. (Tr. 332.) In 2008 and early 2009, Dr. Kenneth Sullivan also treated Plaintiff for fibromyalgia, prescribing her pain medication and providing her with a handicapped parking placard. (Tr. 470–524; 588–607.) Throughout 2008, Plaintiff described her pain level while medicated as a four or a five on a scale of one to ten. (*See, e.g.*, Tr. 480, 483, 487, 489, 491, 493.) She was prescribed the muscle relaxant Zanaflex by Dr. Ladson in February 2009 after complaining of "pain all over." (Tr. 326–28.)

On September 30, 2005, Dr. Ladson examined a CT scan of Plaintiff's lumbar spine and determined she had mild lumbar spondylosis at L5-S1, with full range of motion of lumbar and cervical spine and the lower extremities. (Tr. 317.) In February 2008, Dr. Sherrod reported Plaintiff's gait was unremarkable and that she could stand and sit with ease. (Tr. 401.) In July 2010, Dr. S. Kathryn Steele, a consultative examining physician, indicated that Plaintiff's "gait was normal." (Tr. 609.)

---

[3] Plaintiff testified that she had been diagnosed with fibromyalgia by a specialist years earlier (Tr. 41), however there is no evidence in the record to support this assertion.

In 2006, a chest x-ray of Plaintiff showed chronic lung changes resulting from chronic obstructive pulmonary disease ("COPD"). (Tr. 361.) Throughout 2008 and 2009, Plaintiff had periodic occurrences of both acute bronchitis and sinusitis, although the records appear to indicate such was treated with antibiotics without complication. (Tr. 470–471, 476–81, 511.) While Plaintiff's medical records regarding her respiratory functionality reference both shortness of breath and COPD, such records infrequently indicated wheezing, rales, or rhonchi. (*See, e.g.*, Tr. 327, 338–371, 470–81, 483–511, 588.)

On August 18, 1997, Dr. Richard T. Hoos of the Neurology Group diagnosed Plaintiff with moderate obesity (Tr. 304), however her medical records since lack any consistent reference to obesity. In December 2007, Plaintiff's medical records show she weighed 145 pounds and was four feet, eleven inches in height, and in March 2010, she weighed 161 pounds. (Tr. 448, 568) In May 2010, Plaintiff testified that she weighed 150 pounds. (Tr. 43.) Dr. Sherrod noted in her report that Plaintiff was "overweight, but also that Plaintiff was able to walk and stand sufficiently. (Tr. 401.)

### 2. Mental Impairments

At the hearing before ALJ Dougherty, Plaintiff testified that she was diagnosed with bipolar disorder in 1997. (Tr. 54.) She stated that she was, at that time, prescribed Cymbalta, Seroquel, Klonopin, and Wellbutrin, and that her bipolar disorder is "cyclical and seasonal." (Tr. 45.) She described herself as "really unstable," and claimed that her husband had left her and her two children because he was tired of "living with a crazy person." (Tr. 46.)

In 1997, Dr. Hoos diagnosed Plaintiff with chronic depression. (Tr. 304.) She was diagnosed with bipolar disorder with psychotic features and dependent personality disorder in

1999 by Dr. Jeri Lee. (Tr. 310.) At the same time, she was also diagnosed with cocaine and cannabis dependence, but had reportedly been in remission for nine years. (*Id.*) In 2005, Dr. Ladson diagnosed Plaintiff with a severe mood disorder. (Tr. 317.)

Plaintiff began treatment at LifeCare Family Services on July 17, 2007, at which time Terry Cheatham, M.A., diagnosed Plaintiff with bipolar disorder. (Tr. 373–76.) During her initial visit, Plaintiff was also given a GAF Score of 45. (Tr. 373.) LifeCare records indicate her mood was "stable" in July, August, and September 2007, although she complained of financial and familial concerns. (Tr. 378, 380, 382.) Treatment notes also indicate that throughout her treatment at LifeCare, Plaintiff was able to concentrate and had an intact memory. (Tr. 373, 384, 391, 396. *But see* Tr. 385 (noting Plaintiff's attention as "easily distracted").) In October 2007, Angela Wood, LPN, of LifeCare discontinued the Wellbutrin prescription, increased her Seroquel dosage, and continued her on the same amount of Cymbalta and Klonopin. (Tr. 391.) In December 2007, Kay Bush of LifeCare reported Plaintiff had an increased affect and her skin color was visibly more vibrant, but her GAF score had not increased from 45. (Tr. 394.) Medical records reflect that Plaintiff's mood was stabilizing, and her anxiety decreasing, at the end of 2007, but her GAF score remained a 45. (Tr. 396.)

Dr. Sherrod conducted a psychological evaluation of Plaintiff on February 19, 2008, as part of the state agency review of her SSI application. (Tr. 401–07.) Dr. Sherrod reported that Plaintiff's effort on her testing tasks was marginal, and she appeared to make intentional errors at times. (Tr. 404.) Additionally, although she noted Plaintiff had been previously diagnosed with bipolar disorder, Dr. Sherrod concluded that "the symptoms the claimant described . . . do not support the diagnosis of that disorder." (Tr. 406.) She assessed Plaintiff with a GAF score of

60–65 and noted that there appeared to be no limitation in Plaintiff's understanding, memory, concentration, persistence, pace, or adaptive skills. (Tr. 407.)

In February and April 2008, Ms. Wood reported that Plaintiff was able to concentrate, but she had a tearful affect, depressed mood, and increased stressors accompanied by increased symptoms. (Tr. 525–32.) In June 2008, Ms. Wood prescribed Vistaril for anxiety. (Tr. 535.) In late 2008, Plaintiff's mood was "stable," and she had no symptoms of psychosis, mania, depression, or anxiety. (Tr. 537–47.) In March 2009, Charles Boyd of LifeCare reported Plaintiff's mood was dejected because she was facing eviction from her home. (Tr. 551.)

On May 18, 2009, Ms. Wood and Dr. Cynthia Rector cosigned a Medical Source Statement of Ability to Do Work-Related Activities (Mental) (the "Wood/Rector opinion"), assessing how Plaintiff's mental and emotional capabilities are affected by her impairment. (Tr. 563–65.) Although it is unclear from the Wood/Rector opinion, during the hearing before ALJ Dougherty, Plaintiff's attorney indicated that Dr. Rector is the supervising physician at LifeCare. (Tr. 35.) Ms. Wood had been Plaintiff's primary mental health medical source for over ten years, treating Plaintiff even before she began working at LifeCare. (Tr. 38–39, 44, 45, 205, 208, 255, 280–81, 373–400, 434–54, 525–61, 568–85.) Ms. Wood and Dr. Rector cited Plaintiff's ability to deal with the public and with work stresses as "poor" or "none." (Tr. 563.) In support of the assessment, they wrote Plaintiff "[h]as poor frustration tolerance with limited attention, concentration, and mood stability." (*Id.*) In addition, Ms. Wood and Dr. Rector cited Plaintiff's ability to behave in an emotionally stable manner and relate predictably in social situations as "poor" or "none," and wrote Plaintiff "[h]as Bipolar I D/O with unpredictable mood stability, anxiety, poor coping skills, and poor ability to adapt to change." (Tr. 564.)

8

In October 2009 and February 2010, Ms. Wood reported that Plaintiff was able to concentrate and had sufficient memory, a "stable" mood, and no symptoms of psychosis or mania. (Tr. 570, 574.) Plaintiff explained that she was was "[c]oping well," despite her situation, but her GAF score remained at 45. (*Id.*)

Dr. Steele evaluated Plaintiff and wrote a Mental Status Report on July 5, 2010. (Tr. 608–15.) She concluded that Plaintiff "appeared to meet criteria for a mood disorder," but that her symptoms seemed to be well-managed through medication and therapy. (Tr. 610.) Dr. Steele assessed Plaintiff with a GAF score of 55, and concluded that Plaintiff was unlikely to have difficulty understanding instructions, was able to respond to requests appropriately, was capable of sustaining concentration, and was able to adapt to changes. (Tr. 611.) She did report, however, that Plaintiff would likely have "mild to moderate difficulties in interacting appropriately" with co-workers and that her coping skills may "lead to decompensation under new stressors." (*Id.*)

### 3. Daily Activities and Employment History

In her 2007 Fatigue Questionnaire and Function Report, Plaintiff reported she cared for her children, her disabled mother, and her pets. (Tr. 223, 226.) She was able to count change, handle a savings account, and use a checkbook and money orders. (Tr. 228.)

Plaintiff recounted her previous work as an insurance underwriter, office manager, and secretary, but stated she had been unable to perform any type of gainful employment since November 1, 1995. (Tr. 202, 203.) She also indicated she had not received vocational rehabilitation, employment, or other support services. (Tr. 209.)

Treatment records from LifeCare reflect that Plaintiff performed "Domestic Duties including child care" in November and December 2007. (Tr. 389, 394.) In February 2008, Plaintiff told her physician she was "trying to get her disability and she was 'afraid' if she gets a job she may not get disability." (Tr. 399.)

In February 2008, Plaintiff told Dr. Sherrod that she would wake at 6:00 a.m., eat breakfast, drive her children to the bus stop, pick them up, and make them dinner. (Tr. 403.) She also slept in the afternoon and would go to bed after dinner, but would be "up and down" throughout the day. (*Id.*) Plaintiff stated she was able to attend to her own self-care and do some household chores. (Tr. 404.) Plaintiff indicated she would attend church once or twice a month, but did not have any friends and did not visit her family. (*Id.*) Dr. Sherrod thought that Plaintiff "appear[ed] to be more functional than she claims." (Tr. 406.) Also in 2008, Plaintiff reportedly helped her husband run his construction company, took her family on vacation in Florida, and was able to do household chores, but only on good days. (Tr. 450, 453, 537.)

At the hearing before ALJ Dougherty, Plaintiff testified that she would prepare her children for school in the mornings, but did not make them breakfast and would take naps most of the day. (Tr. 47.) On good days she could do laundry and make dinner, but on bad days she would "sit around and play some on the computer." (*Id.*) In regard to her personal care, Plaintiff testified that on some days she would not get out of bed or bathe. (Tr. 52.) She stopped working in 1995 because "[a]ll of [her] jobs have end up with [her] going manic and getting in trouble at work, and then losing [her] job." (Tr. 48.) According to Plaintiff, her husband or mother would take her to appointments and to the grocery store, and she did not leave the house except to go to medical appointments. (Tr. 49.) Plaintiff experienced extreme drowsiness, loss of

concentration, and dry mouth as side effects from her medications. (Tr. 50.) In regard to her husband's construction business, Plaintiff testified that she would just answer the phone and put jobs up on the whiteboard, but that she had not helped him in eight years.[4] (Tr. 55.)

In July 2010, Plaintiff told Dr. Steele that she had a very limited daily routine which included waking at 9:00 a.m., playing on the computer, reading the Bible, taking naps, talking to her children, and watching television. (Tr. 609.) She reported she did not like leaving the house and would dress only to attend appointments. (*Id.*) Dr. Steele indicated Plaintiff was able to drive herself to the appointment, arrive on time, and was dressed appropriately. (*Id.*) She was also able to complete the paperwork on her own. (*Id.*)

## II. STANDARD OF REVIEW

The Court's review of the Report is *de novo*. 28 U.S.C. § 636(b) (2012). However, this review is limited to "a determination of whether substantial evidence exists in the record to support the [Commissioner's] decision and to a review for any legal errors." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Title II of the Social Security Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g) (2012). Accordingly, if the Commissioner adopts the ALJ's decision, the reviewing court will uphold the decision if it is supported by substantial evidence. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Substantial evidence is a term of art and is defined as "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is "more than a

---

[4] As the hearing took place in 2010, Plaintiff's assertion appears to conflict with Plaintiff's medical records from 2008 indicating she helped her husband with his construction company. (*See* Tr. 450, 453.)

mere scintilla of evidence, but less than a preponderance." *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 245 (6th Cir. 1996) (citing *Consol. Edison*, 305 U.S. at 229).

"Where substantial evidence supports the Secretary's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion." *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999). This standard of review is consistent with the well-settled rule that the reviewing court in a disability hearing appeal is not to weigh the evidence or make credibility determinations, because these factual determinations are left to the ALJ and to the Commissioner. *Hogg v. Sullivan*, 987 F.2d 328, 331 (6th Cir. 1993); *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). Thus, even if the Court would have come to different factual conclusions as to the Plaintiff's claim on the merits than those of the ALJ, the Commissioner's findings must be affirmed if they are supported by substantial evidence. *Hogg*, 987 F.2d at 331.

## III.  ANALYSIS

### A.  ALJ Dougherty's Decision

To be eligible for SSI, a claimant has the ultimate burden to establish he or she is entitled to benefits by proving his or her

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A) (2012). The claimant's "physical or mental impairment" must "result[]" from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). At the

administrative level of review, the claimant's case is considered under a five-step sequential

evaluation process as follows:

1. If the claimant is working and the work constitutes substantial
   gainful activity, benefits are automatically denied.

2. If the claimant is not found to have an impairment which
   significantly limits his or her ability to work (a "severe"
   impairment), then he or she is not disabled.

3. If the claimant is not working and has a severe impairment, it must
   be determined whether he or she suffers from one of the "listed"
   impairments[5] or its equivalent; if a listing is met or equaled,
   benefits are owing without further inquiry.

4. If the claimant does not suffer from any listing-level impairments,
   it must be determined whether the claimant can return to the job he
   or she previously held in light of his or her residual functional
   capacity ("RFC") (e.g., what the claimant can still do despite his or
   her limitations); if the claimant has the RFC to do his or her past
   relevant work, the claimant is not disabled. If the claimant is not
   able to do any past relevant work or does not have any past
   relevant work, the analysis proceeds to step five.

5. At the last step it must be determined whether the claimant is able
   to do any other work. At this step, the Commissioner must provide
   evidence of the existence of a significant number of jobs in the
   national economy which the claimant could perform, given his or
   her age, experience, education, and RFC.

20 C.F.R. § 416.920(a) (2014); *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Here, ALJ Dougherty found under the five-step analysis that (1) Plaintiff had not engaged

in substantial gainful activity since the application date; (2) Plaintiff's obesity, mild lumbar

spondylosis at L5/S1, fibromyalgia, and chronic obstructive pulmonary disease are considered

"severe"; (3) Plaintiff did not have an impairment that met or medically equaled one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, App. 1; (4) Plaintiff is unable to perform any past

---

[5] The Listing of Impairments is found at 20 C.F.R. Part 404(P), App. 1 (2014).

relevant work; and (5) considering Plaintiff's age, experience, education, and RFC, there was other work Plaintiff could perform. (Tr. 14, 19, 24.) Accordingly, ALJ Dougherty concluded that Plaintiff has not been under a disability at any time through the date of his decision. (Tr. 25.)

### B. Plaintiff's Objections to the Report

Plaintiff raises two objections to Magistrate Judge Knowles's Report. (Doc. No. 16.) Plaintiff first argues that Magistrate Judge Knowles incorrectly concluded that ALJ Dougherty gave appropriate weight to Plaintiff's treating sources from LifeCare. (Doc. No 16 at 1–2.) Plaintiff also argues Magistrate Judge Knowles erred in determining that ALJ Dougherty properly concluded that Plaintiff's testimony was not fully credible. (*Id.* at 2–3.) The Court addresses each objection in turn.

#### 1. Weight Given to Opinion of Treating Sources

First, Plaintiff objects that Magistrate Judge Knowles erred in concluding that ALJ Dougherty appropriately weighed the Wood/Rector opinion. (Doc. No. 16 at 1–2.) In regard to Plaintiff's mental limitations, ALJ Dougherty concluded that Plaintiff is able to concentrate, focus, and perform tasks with adequate persistence and pace; she is not easily frustrated and able to work with average speed; her social skills are mildly limited but adequate; and her adaptive skills are not limited. (Tr. 19.) In so concluding, ALJ Dougherty discounted the Wood/Rector opinion, which stated Plaintiff has poor or no ability to deal with work stresses; poor frustration tolerance with limited attention, concentration, and mood stability; poor or no ability to behave in an emotionally stable manner; poor or no ability to relate predictably in social situations;

Bipolar I disorder with an unpredictable mood stability; anxiety; poor coping skills; and poor ability to adapt to change. (Tr. 563–64.)

Plaintiff argues that even if the Wood/Rector opinion is not controlling, ALJ Dougherty should have still afforded it greater weight than the opinion of Dr. Sherrod, a consultative examining physician. (Doc. No. 16 at 1–2.) Plaintiff argues that ALJ Dougherty was required to discuss the factors listed in 20 C.F.R. § 416.927 and § 404.1527 in deciding to give Dr. Sherrod's opinion more weight than the Wood/Rector opinion. (*Id.*) According to Plaintiff, because ALJ Dougherty did not explicitly discuss the factors in weighing the Wood/Rector opinion, even if he considered the factors and appropriately discussed why the Wood/Rector opinion was not controlling, his conclusion is not based on substantial evidence. (*Id.*)

Federal regulations require the ALJ to evaluate every medical opinion in the record before coming to a decision. 20 C.F.R. § 416.927(c) (2014). The opinions of the claimant's treating medical professionals[6] are generally given controlling weight provided the opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." *Id.* § 416.927(c)(2). Even when not given controlling weight, an ALJ must apply the following factors in determining what weight to afford a treating source's opinion: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the

---

[6] A "treating source" is defined in the relevant federal regulation as "[claimant's] own physician, psychologist, or other acceptable medical source who provides [claimant] or has provided [claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [claimant]." 20 C.F.R. § 416.902 (2014). A medical source will not be considered a "treating source" if the "relationship with the source is not based on [claimant's] medical need for treatment or evaluation, but solely on [claimant's] need to obtain a report in support of [claimant's] claim or disability." *Id.*

specialization of the treating source, and (6) any other facts that tend to support or contradict the opinion. *Id.* § 416.927(c)(2)–(6); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Even where a treating physician's opinion is not controlling, there remains "'a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference.'" *Germany-Johnson v. Comm'r of Soc. Sec.* 313 F. App'x 771, 777 (6th Cir. 2008) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007)). However, the ALJ is not bound by the opinion of the treating physician, provided he articulates a justification for his assessment. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). Regulations require the ALJ to "always give good reasons in [the] notice of determination or decision for the weight" given to the opinion of a claimant's treating physician, which courts refer to as the "reason-giving requirement." 20 C.F.R. § 416.927(c)(2); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406–07 (6th Cir. 2009). In order to comply with the reason-giving requirement, an ALJ's reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *Blakely*, 581 F.3d at 406–07.

In her Objection, Plaintiff cites *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742 (6th Cir. 2007), for her contention that an ALJ must discuss the factors listed in § 404.1527(c)(2)–(6)[7] and § 416.927(c)(2)–(6) if he affords a non-treating source more weight than a treating source, even if he discusses why the opinion is not controlling. (Doc. No. 16 at 1–2.) The ALJ in *Bowen*,

---

[7] This section of federal regulations provides for identical requirements regarding medical opinions in the context of claims for Social Security Disability Insurance ("SSDI"), which Plaintiff has not filed a claim for in this case.

however, did not even mention the treating physician's opinion, which Sixth Circuit held "plainly violated the terms" of § 404.1527(c)(2). 478 F.3d at 747. While *Bowen* held that an ALJ must "give good reasons" in rejecting a treating source's opinion, the case does not stand for the proposition that an ALJ is required to explicitly discuss each factor listed in § 404.1527(c)(2)–(6) and § 416.927(c)(2)–(6) when discounting a treating source's opinion, as Plaintiff suggests. *See id.*

Here, while Dr. Rector's treatment relationship with Plaintiff is unclear,[8] Ms. Wood qualifies as a treating source under the regulations, *see* 20 C.F.R. §§ 404.1502, 416.902 (2014), as she is a medical source who has an ongoing treatment relationship with Plaintiff (Tr. 38–39, 44–45, 205, 208, 255, 280–81, 373–400, 434–54, 525–61, 568–85). Thus, ALJ Dougherty was required to give good reasons for not relying on the Wood/Rector opinion in order to comply with the reason-giving requirement and to weigh the factors listed in 20 C.F.R. § 416.927(c)(2)–(6).

The Court finds ALJ Dougherty complied with the reason-giving requirement, providing adequate support for the decision to afford the Wood/Rector opinion less weight. In regard to whether the Wood/Rector opinion was controlling, ALJ Dougherty found that the opinion "is not well supported by clinical findings . . . or psychological diagnostic techniques," citing LifeCare medical records which "indicated her mood was 'stable' with no symptoms of psychosis, mania, anxiety or depression" and reported that Plaintiff "is able to concentrate, remember and her judgment, reliability and insight are fair." (Tr. 24 (citing Tr. 566–86).) Additionally, ALJ

---

[8] Plaintiff did not list Dr. Rector as a treating physician in her December 7, 2007, Disability Report (Tr. 204–07), her May 15, 2008, Disability Report Appeal (Tr. 254), or her October 30, 2008, Disability Report Appeal (Tr. 279–80.) Additionally, Dr. Rector is not listed as a treating physician in any of the treatment notes provided by LifeCare. (Tr. 372–400, 434–54, 525–61, 566–86.) It appears that Dr. Rector is a physician at LifeCare Family Services, and associated with Ms. Wood. (Tr. 35, 41.)

Dougherty found that the Wood/Rector opinion was inconsistent with other substantial evidence in the case record, including evidence that Plaintiff "is able to help her husband run his construction company, including a good range of daily activities performed." (Tr. 24.) Thus, ALJ Dougherty gave good reasons for not affording the Wood/Rector opinion controlling weight in accordance with § 416.927(c)(2).

ALJ Dougherty further provided the following reasons for discounting the Wood/Rector opinion: (1) "Nurse Wood relied heavily upon subjective complaints of symptoms and therefore, her assessment may not represent an objective opinion"; (2) Plaintiff's credibility was in doubt "due to [her] past history of substance abuse and inconsistencies in her reporting"; (3) Plaintiff had "stated she was afraid to return to work because it might interfere with receiving disability benefits"; and (4) consulting examining psychologist Dr. Sherrod "reported [Plaintiff] exhibited 'marginal' effort on testing." (Tr. 24.) By providing the above support of contrary evidence in the record, and specifying what weight he afforded the treating source's opinion and why, ALJ Dougherty satisfied the reason-giving requirement in discounting the Wood/Rector opinion. *See* SSR 96-2p, 1996 WL 374188, at *5 .

Accordingly, the Court finds the weight ALJ Dougherty afforded the Wood/Rector opinion was supported by substantial evidence.

### 2. ALJ Dougherty's Evaluation of Plaintiff's Credibility Regarding Subjective Complaints

Next, Plaintiff argues that Magistrate Judge Knowles erred in concluding that ALJ Dougherty's finding that Plaintiff was not fully credible was based on substantial evidence. (Doc. No. 16 at 2–3.) Plaintiff asserts that in assessing her credibility, ALJ Dougherty relied too heavily on Dr. Sherrod's report. (Doc. No. 16 at 2–3.) Additionally, she argues that ALJ

Dougherty should not have discredited her testimony simply because he disagreed with her primary-care physician's treatment method for her fibromyalgia. (*Id.* at 3.)

Under 42 U.S.C. § 423(d)(5)(A):

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain.

*See also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 230 (6th Cir. 1990). When considering a claimant's statements regarding symptoms, the ALJ follows a two-factor test. First, the ALJ determines if there is objective medical evidence of a physical or mental impairment. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *see also* 20 C.F.R. § 416.929 (2014). If such evidence exists, the ALJ next determines whether there is objective medical evidence to confirm the severity of the alleged symptoms arising from the impairment, or whether the impairment is of such severity that it could reasonably be expected to produce the alleged symptoms. *Walters*, 127 F.3d at 531; *see also* 20 C.F.R. § 416.929.

When, under the second factor, a claimant's statements about his or her symptoms are not substantiated by objective medical evidence, the ALJ may assess the claimant's credibility to determine validity of the statements. *Walters*, 127 F.3d at 531.

The ALJ evaluates a claimant's subjective statements of disability by examining the claimant's daily activities; the location, duration, frequency, and intensity of claimant's pain; the precipitating and aggravating factors; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)

19

(identical provision of federal regulations governing SSDI)). After evaluating these factors in conjunction with the evidence in the record, and making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible, provided the assessment is supported by substantial evidence. *See, e.g., Walters*, 127 F.3d at 531; *Blacha*, 927 F.2d at 230–31; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981). An ALJ must give reasons for rejecting a claimant's testimony regarding pain. *Felisky*, 35 F.3d at 1036. However, an ALJ's finding regarding the credibility of a claimant's testimony is entitled to great deference because the ALJ observes the claimant's demeanor and credibility directly. *Walters*, 127 F.3d at 531; *Blacha*, 927 F.2d at 230. Additionally, if there are "demonstrable discrepancies" between a plaintiff's testimony and other portions of the record, the court should be "particularly reluctant" to set aside an ALJ's credibility finding. *Gooch v. Sec'y of Health & Human Servs.*, 833 F.3d 589, 592 (6th Cir. 1987).

Here, under the first factor, ALJ Dougherty concluded that there was objective medical evidence of an impairment that could reasonably be expected to produce Plaintiff's alleged symptoms. (Tr. 22.) He concluded that: (1) Plaintiff's chronic obstructive pulmonary disease was "severe," requiring a restriction on exposure to fumes, odors, and gases be added to her RFC (Tr. 20–21); (2) medical evidence of Plaintiff's back problems and fibromyalgia necessitated a limitation of lifting and/or carrying fifty pounds occasionally and twenty-five pounds frequently (Tr. 21); and (3) although medical evidence mentioned obesity as an impairment, there was no significant evidence of a limitation due to obesity (Tr. 21–22).

After finding that objective medical evidence existed that could reasonably be expected to produce Plaintiff's alleged symptoms, ALJ Dougherty considered whether objective medical evidence confirmed the severity of Plaintiff's alleged symptoms, ultimately finding that Plaintiff had not "experienced any pain, shortness of breath, depression, anxiety or other symptomatology of a disabling level of severity." (Tr. 22.) In support of his conclusion, ALJ Dougherty stated:

> Diagnostic tests have not revealed the presence of impairments suggestive of a disabling level of pain/symptoms. Treating physicians/mental health providers have continued to treat complaints of pain/symptoms conservatively. . . . Radiographic/diagnostic evidence demonstrates few physical problems . . . . Also, test results and subjective complaints have not prompted recommendations for surgery or inpatient treatment. . . . On physical examination, "tenderness" has been used to describe pain and/or discomfort; a term not convincingly descriptive of severe or disabling pain. Specific references to pain include reports in January, February, March and August 2008, wherein she described her pain level as a 4 or a 5 on a scale of 1 to 10, with medications. . . . In January 2010, Dr. Sullivan assessed chronic pain, but not severe pain. . . . Despite allegations of chronic severe pain, she has engaged in a wide range of daily activities. . . .
>
> [T]here is minimal objective evidence to show she has had excessive or limited side effects from medications. The side effects occasionally alleged have been minor and easily remedied and no physician has reported any problem prescribing alternative effective medications. The presence of significant medication side effects is also refuted by her range of daily activities.

(Tr. 22–23 (citing Tr. 480, 489, 491, 493, 588).) The above constitutes substantial evidence in support of ALJ Dougherty's conclusion that objective evidence did not show a disabling severity of Plaintiff's alleged symptoms. Accordingly, ALJ Dougherty's assessment of Plaintiff's credibility was warranted. *See Walters*, 127 F.3d at 531.

Moreover, in his decision, ALJ Dougherty discusses several inconsistencies in the record and in Plaintiff's testimony that detract from her credibility. First, although Plaintiff had testified

that she had lost all of her previous positions due to her impairments (Tr. 48, 53–54), in other reports, Plaintiff stated she had lost jobs due to other reasons, such as brown recluse spider bites and possible methicillin-resistant staphylococcus aureus infection, attending school, the employer's business closing, and a physical altercation with her ex-husband. (Tr. 14, 22 (citing Tr. 403).) Second, ALJ Dougherty found that "her activities of daily living are inconsistent with allegations of disability." (Tr. 22.) In support, he cited the following parts of the record: in 2007, she reportedly cared for her children, mother and animals; November 2007 treatment records reflected that she performed domestic duties; in December 2007, Plaintiff and her mentally ill daughter helped an eighteen-year-old pregnant teenager; in February 2008, Plaintiff reported she was able to get her children up, pick them up from school, make sure they did their homework, and fix them dinner; in April 2008, she stated she would help her husband with his business; and she was able to drive herself to the consultative examination in July 2010 and complete the required paperwork on her own. (Tr. 17–18 (citing Tr. 225–26, 389, 394, 403–04, 450, 609).) Finally, ALJ Dougherty questioned Plaintiff's credibility because healthcare providers at LifeCare found her to be only "moderately" cooperative throughout her treatment there (Tr. 374), she told LifeCare she was "trying to get her disability and she was 'afraid' if she gets a job she may not get disability" (Tr. 399), and she had not received any vocational rehabilitation or employment services that might help her find a job (Tr. 209). (Tr. 22.)

Given the foregoing, ALJ Dougherty properly cited reasons for not finding Plaintiff credible with regards to her symptoms.[9] *See Felisky*, 35 F.3d at 1036. Contrary to the assertions

---

[9] The Court notes that, with regard to her participation level with providers at LifeCare, the record indicates some fluctuation in Plaintiff's cooperation. (*See, e.g.*, Tr. 380.) However, on the whole, the treatment notes from LifeCare do generally indicate Plaintiff was "moderately cooperative," along with some instances of less cooperation. (*See, e.g.*, Tr. 399.)

in Plaintiff's Objection to the Report, ALJ Dougherty did not rely solely on Dr. Sherrod's report and his disagreement with her primary-care physician's treatment method for Plaintiff's fibromyalgia in discounting Plaintiff's subjective complaints. Because the record contains "demonstrable discrepancies," the Court defers to ALJ Dougherty's finding of credibility. *See Gooch*, 833 F.3d at 592. The Court thus finds ALJ Dougherty's decision to discredit Plaintiff's testimony regarding her subjective complaints was supported by substantial evidence.

## IV. CONCLUSION

For the reasons stated above, the Court agrees with Magistrate Judge Bryant's determination that substantial evidence in the record supported ALJ Dougherty's decision to deny benefits to Plaintiff and, therefore, **ADOPTS** the Report in its entirety. (Doc. No. 15.) Plaintiff's Motion (Doc. No. 12) is **DENIED** and decision of the Commissioner is **AFFIRMED**. Additionally, the Commissioner's Motion for a Stay Because of Lapse of Appropriations (Doc. No. 17) is **TERMINATED AS MOOT**. Accordingly, the case is hereby **DISMISSED**. The Clerk of the Court is **DIRECTED** to close the case.

It is so ORDERED.

Entered this the 3 day of July 2014.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT